**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**
─────────────────────────────────

**UNITED STATES OF AMERICA,**

        **Plaintiff,**

        **v.**                         **05-CR-045S**

**JOHN WESLEY DeGOUNETTE, III and**
**ANDREW BUXTON,**

        **Defendants.**
─────────────────────────────────

## REPORT, RECOMMENDATION AND ORDER

This case was referred to the undersigned by the Hon. William M. Skretny, in accordance with 28 U.S.C. § 636(b)(1), for all pretrial matters and to hear and report upon dispositive motions.

## PRELIMINARY STATEMENT

The defendants, John DeGounette, III ("DeGounette") and Andrew Buxton ("Buxton"), are charged in a multi-count indictment with having violated Title 21 U.S.C. §§ 952(a) and 963 and Title 18 U.S.C. §§ 922(g)(3) and 924(c)(1) and (2).  (Docket #13).  The defendant Buxton has filed a motion to suppress evidence (Docket #16) which has been joined in by the co-defendant DeGounette (Docket #19).  The government has filed opposition to the motion.  (Docket #18).

A suppression hearing was held by this Court on April 21, 2005, and a transcript of that proceeding was filed.  (Docket #21).

**FACTS**

At approximately 8:35 p.m. on December 19, 2004, a dark blue Dodge Durango SUV, travelling from Canada, approached the primary inspection booth manned by Customs and Border Protection Officer James A. Bitterman at the Peace Bridge port of entry and was subjected to inspection.  (T. 4-7).[1]

The vehicle was occupied by two individuals who were subsequently identified as the defendants, Buxton and DeGounette.  Because the windows of the vehicle were tinted, Officer Bitterman asked the driver of the vehicle (Buxton) to lower the window on the passenger door immediately behind the driver's side of the vehicle. (T. 8, 16).  He then looked into the vehicle and observed "two gym bags on the back seat."  (T. 9).  He reached into the vehicle and asked, "Whose gym bag," and Buxton "responded that it was his."  Thereupon, Bitterman "opened the gym bag and stuck [his] hand inside to kind of search around and see what may be in it."  (T. 9, 17).  He "found a plastic container and pulled it out" since he knew "that it was a container that usually would hold a weapon, a pistol."  He "opened it up and saw an automatic weapon in there."  As a result, he asked both occupants of the vehicle if "there were any other firearms in the vehicle" and "both responded that there were other weapons in the vehicle."  Up to this point, neither occupant of the vehicle was in custody.  (T. 10, 22, 51).  Once he found the gun, Officer Bitterman, for the purpose of "safety," "asked [the

---

[1] "T" refers to transcript of testimony given at the suppression hearing of April 21, 2005.

occupants] to put their hands on the dashboard" and he removed the weapon from the vehicle.  (T. 17, 18, 37, 38, 39, 41).  He then called for assistance, and upon arrival of such, he advised his fellow officers "that there were other weapons in the vehicle, and that the individuals need[ed] to be taken out of the vehicle."  (T. 21, 32, 39).  Shortly thereafter, a call was placed to Special Agent Robert Lamoureaux of the Immigration Customs Enforcement ("ICE") and he was advised "of a vehicle entering the U.S. with occupants with weapons and narcotics."  Special Agent Lamoureaux arrived at the Peace Bridge facility sometime between 9:00 and 10:00 p.m. on December 19, 2004, and upon his arrival, he viewed the vehicle in question and the weapons retrieved from it and then called the Buffalo Police to report this finding.  Thereupon, he proceeded to the holding cells at the Peace Bridge facility where he observed the defendants and identified himself to them as a law enforcement officer.  (T. 123-124, 131, 132, 135-136).  Special Agent Lamoureaux did not question the defendants at that time, but rather, awaited the arrival of the Buffalo Police.  (T. 144).

Detective Michael Judge, along with Lieutenant Eberhardt of the Buffalo Police Department, arrived at the Peace Bridge facility sometime between 9:00 and 10:00 p.m. on December 19, 2004 in response to Special Agent Lamoureaux's call wherein they were advised that there were two individuals "that had marijuana and weapons."  (T. 54, 74, 76, 91, 92).  Special Agent Lamoureaux advised Detective Judge that he had not questioned the defendants nor had he "read them their rights."  It was then understood that Detective Judge would "read the rights" to the defendants and Special Agent Lamoureaux would question them after they had been advised of their

rights.  (T. 135-136, 144).  Detective Judge and Special Agent Lamoureaux entered the

holding cell where Buxton was being held with his hands handcuffed.  Detective Judge

identified himself as a police officer to the defendant Buxton and then advised him of

his rights by reading from a "Miranda card."  (T. 110-111, 115-116, 56-57, 92, 96, 109;

Government Exhibit 3).  Special Agent Lamoureaux was present in the room with

Detective Judge and heard him give the advice of rights to the defendant Buxton.

(T. 126, 130-131, 138, 146).  After "reading his rights" to him, Detective Judge asked

Buxton if he understood "each of these rights," and Buxton replied, "Yes."  (T. 58, 116).

Special Agent Lamoureaux heard Buxton acknowledge that he understood his rights.

(T. 126, 130-131, 138, 146).  Thereupon, Special Agent Lamoureaux asked Buxton,

"Whose guns are they" and asked him about the alleged marijuana that was also found

in the vehicle.  (T. 128-129).  In response to the question about the guns, Buxton stated

that "they belong[ed] to DeGounette" but did not say anything about the marijuana.[2]

(T. 128-129, 141).


Detective Judge and Special Agent Lamoureaux then proceeded to the

other holding cell where a handcuffed DeGounette was being held.  Both Detective

Judge and Special Agent Lamoureaux identified themselves as law enforcement

officers to DeGounette, and after doing so, Detective Judge advised him of his rights by

"read[ing] them off the Miranda card" (Government Exhibit 3) and DeGounette

acknowledged to Detective Judge and Special Agent Lamoureaux that he understood

---

[2]  Detective Judge testified that after he advised Buxton of his rights, Buxton indicated that he did not wish to speak to him at that time.  (T. 58, 84, 111-112).

his rights.  (T. 63-64, 64-65, 92, 96, 97, 98, 100).  After DeGounette had been advised

of his rights by Detective Judge, Special Agent Lamoureaux asked him about the

weapons that were found in the vehicle and DeGounette stated that "the guns belonged

to him" and that "he had legally purchased them and that he had permits."  (T. 132, 146,

147).  However, he did not respond when questioned by Special Agent Lamoureaux

about the marijuana.  (T. 133).

Thereafter, both Buxton and DeGounette were escorted from the holding

cells to the garage area of the Peace Bridge facility to await transportation to Buffalo

Police headquarters.  While being so escorted, Buxton "spontaneously" stated to

Detective Judge, "You'd have a gun too, because where we come from you get stuck

with an ice pick or shot."  (T. 59, 60, 70, 81, 83, 84, 85, 112).

While in the garage area of the Peace Bridge facility, Detective Judge

asked DeGounette, "What were you doing with the guns" and he "spontaneously" said

"that his aunt had told him that it was dangerous up there, referring to Canada, and

that's why he had the weapons."  (T. 99, 113, 117, 65-66).

Special Agent Lamoureaux also testified that while they were in the

garage area of the Peace Bridge facility, Buxton "spontaneously referred to the guns

being used for - - needed for protection, and also about being an ice pick in the gut"

(sic) and that Buxton further stated, "It's a tough place [Canada], you can get an ice

pick in the gut."  (T. 129-130, 142).

As to DeGounette, Special Agent Lamoureaux testified that while they were in the garage area of the Peace Bridge, DeGounette, without being questioned, volunteered that "he had an aunt - an aunt in Canada, and that it was a rough place and he needed protection."  (T. 133-134, 148).

Detective Judge testified that both defendants indicated they had guns in Canada for protection.  (T. 59, 62, 93).

Detective Judge prepared a 710.30 statement form (Government Exhibit 6) wherein he recorded the statement made by DeGounette (T. 66-67, 94).

The defendant Buxton testified in his own behalf at the suppression hearing and unequivocally denied that he had been advised of his rights on December 19, 2004 by Detective Judge or Special Agent Lamoureaux or any other law enforcement officer.  (T. 152).

## DISCUSSION AND ANALYSIS

The defendants argue that "because [they] did not receive *Miranda* warnings at the inspection lane, nor at the time [they] were interrogated by Lamoureaux and Judge, all alleged statements must be suppressed, for violation of United States Constitution (sic), *Miranda v. Arizona*, 384 U.S. 436, 444-45 (1966), and *Dickerson v. United States*, 530 U.S. 428 (2000).  It is pointed out that the defendants do not seek or

attempt to seek suppression of the evidence discovered and removed from the vehicle

on December 19, 2004.  Had they done so, it would have been to no avail for as the

United States Supreme Court has held:

> . . . Since the founding of our Republic, Congress has granted the Executive plenary authority to conduct routine searches and seizures at the border without probable cause or a warrant, in order to regulate the collection of duties and to prevent the introduction of contraband into this country. *See United States v. Ramsey*, 431 U.S. 606, 616-617, 52 L.Ed.2d 617, 97 S.Ct. 1972 (1977), citing Act of July 31, 1789, Ch. 5, 1 Stat. 29.

> Consistently, therefore, with Congress' power to protect the Nation by stopping and examining persons entering this country, the Fourth Amendment's balance of reasonableness is qualitatively different at the international border than in the interior.  Routine searches of the persons and effects of entrants are not subject to any requirement of reasonable suspicion, probable cause, or warrant, and first-class mail may be opened without a warrant on less than probable cause.  *Ramsey, supra.*  Automotive travelers may be stopped at fixed checkpoints near the border without individualized suspicion even if the stop is based largely on ethnicity, *United States v. Martinez-Fuerte*, 428 U.S. 543, 562-563, 49 L.Ed.2d 1116, 96 S.Ct. 3074 (1976), and boats on inland waters with ready access to the sea may be hailed and boarded with no suspicion whatever.  *United States v. Villamonte-Marquez, supra.*

> These cases reflect longstanding concern for the protection of the integrity of the border.  This concern is, if anything, heightened by the veritable national crises in law enforcement caused by smuggling of illicit narcotics, *see United States v. Merdenhold*, 446 U.S. 544, 561, 64 L.Ed.2d 497, 100 S.Ct. 1870 (1980) (Powell, J. concurring), . . . .

*United States v. Montoya De Hernandez*, 473 U.S. 531, 537-538 (1985).

Furthermore, the search of the gym bag by the inspection officer at the primary point of inspection was also permissible as part of the border inspection.

> The authority of the United States to search the baggage of arriving international travelers is based on its inherent sovereign authority to protect its territorial integrity.  By reason of that authority, it is entitled to require that whoever seeks entry must establish the right to enter and to bring into the country whatever he may carry.  United States v Ramsey, 431 US 606, 620, 52 L Ed 2d 617, 97 S Ct 1972 (1977); Almeida-Sanchez v United States, 413 US 266, 272, 37 L Ed 2d 596, 93 S Ct 2535 (1973); Carroll v United States, 267 US 132, 154, 69 L Ed 543, 45 S Ct 280, 39 ALR 790 (1925).

*Torres v. Puerto Rico*, 442 U.S. 465, 473 (1979); *See also United States v. Charleus*, 871 F.2d 265, 267 (2d Cir. 1989); *United States v. Ogberaha*, 771 F.2d 655, 657 (2d Cir. 1985), *cert. denied*, 474 U.S. 1103 (1986).

However, the defendants argue that the questioning conducted by Officer Bitterman after the discovery of the weapon in the gym bag was in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966) since the defendants were not "free to leave" at that point and they had not been advised of their rights as required by *Miranda*. (Docket #16, p. 5).   More specifically, the defendants assert that the questioning by Officer Bitterman became "an interrogation that [was] custodial in nature" and that the information that he sought from the defendants was for the purpose of using it against them in a criminal proceeding and therefore, he "knew the answers to such statements (sic) could be incriminating."  (Docket #16, pp. 8-10).  In support of this position, the defendants cite *United States v. Mata-Abundiz*, 717 F.2d 1277 (9th Cir. 1983) and

*United States v. Pigott*, 1994 WL 228626 (W.D.N.Y. 1994).  It is this Court's opinion

that those cases are distinguishable from the facts of this case and therefore they do

not apply.  As a result, it is claimed that the responses given by the defendants to

Officer Bitterman's questions must be suppressed.  I disagree.

*Miranda* warnings do not have to be given to one detained at the border

for purposes of being subjected to a routine customs inquiry.  *United States v. Moody*,

649 F.2d 124, 127 (2d Cir. 1981); *United States v. Silva*, 715 F.2d 43, 46 (2d Cir. 1983).

> As the Supreme Court stated in *Carroll v. United States*, 267
> U.S. 132, 154, 45 S.Ct. 280, 285, 69 L.Ed. 543 (1925), the
> rationale behind a routine customs inquiry is that "national
> self protection reasonably requir[es] one entering the country
> to identify himself as entitled to come in, and his belongings
> as effects which may be lawfully brought in."  *See also*
> *United States v. Ramsey*, 431 U.S. 606, 616, 97 S.Ct. 1972,
> 1978, 52 L.Ed.2d 617 (1977) (border searches are
> considered reasonable "pursuant to the long-standing right
> of the sovereign to protect itself by stopping and examining
> persons and property crossing into this country . . . .").  Such
> routine detention and questioning is an inevitable burden
> commonly associated with border crossings and falls within
> the language of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct.
> 1602, 16 L.Ed.2d 694 (1966), which excludes from the
> warning requirements established therein certain "[g]eneral
> on-the-scene questioning as to facts surrounding a crime or
> other general questioning of citizens in the fact-finding
> process" because the "compelling atmosphere inherent" in
> custodial interrogation "is not necessarily present."  384 U.S.
> at 477-78, 86 S.Ct. at 1629-30; *see Chavez-Martinez v.*
> *United States*, 407 F.2d 535, 538-39 (9th Cir.), *cert. denied*,
> 396 U.S. 858, 90 S.Ct. 124, 24 L.Ed.2d 109 (1969); *cf.*
> *United States v. Henry*, 604 F.2d 908, 915 (5th Cir. 1979)

("[t]he *Miranda* requirement is not . . . applicable to every
situation where law enforcement officers are asking questions.").

*Id.* at 47.

At the time of the primary inspection of the defendants and the vehicle,
the defendants were merely being subjected to a "border detention."  The questioning
by Officer Bitterman during that detention amounted to a legitimate "routine" inspection
with "routine" border inspection questions which therefore did not require the giving of
*Miranda* warnings.  Officer Bitterman was "duty-bound to determine whether [the
defendants were] entitled to enter the country with [their] effects."  There was no reason
for Officer Bitterman "to interrupt his customs inquiry of" the defendants at that time.
*United States v. Silva, supra* at 48.  There was no requirement at that time that the
defendants be advised of their rights in accordance with the requirements of *Miranda*
and therefore, it is RECOMMENDED that the defendants' motion to suppress their
statements made to Officer Bitterman be DENIED.

Admittedly, once the defendants were escorted to the holding cells in the
secondary inspection area of the Peace Bridge facility and placed in handcuffs, a
"custodial" situation arose.  The defendants once again assert that since they were in
custody at this time, their constitutional rights were violated and therefore, their
statements should be suppressed.  For the reasons hereinafter stated, I find that the
defendants' claims are without legal merit and are therefore rejected.

Although the defendant Buxton testified that he was never advised of his rights on December 19, 2004 by Detective Judge or Special Agent Lamoureaux or any other law enforcement officer (T. 152), I find his assertion to not be credible and accept the testimony of both Detective Judge and Special Agent Lamoureaux that after identifying themselves as law enforcement officers, Detective Judge, in the presence and hearing of Special Agent Lamoureaux, advised each defendant separately of his rights by reading those rights and warnings from a "Miranda card" and that each defendant acknowledged that he understood his rights.  (T. 110-111, 115-116, 56-57, 92, 96, 109, 126, 130-131, 138, 146; 63-64, 64-65, 92, 96, 97, 98, 100).

It was after being advised of his rights in accordance with *Miranda v. Arizona*, 384 U.S. 436 (1966), that each defendant made the incriminating statements to the officers.  There is nothing in the record before this Court to indicate or support a claim by either defendant that the statements made by each after having been advised of his rights were coerced or involuntarily made.

As the Court of Appeals for the Second Circuit has stated:

> An express written or oral waiver of constitutional rights is not necessary to establish a knowing and voluntary waiver of such rights.  *North Carolina v. Butler*, 441 U.S. 369, 373, 99 S.Ct. 1755, 1757, 60 L.Ed.2d 286 (1979).  A valid waiver may be inferred "from the actions and words of the person interrogated."  *Id.*; *United States v. Rubio*, 709 F.2d 146, at 152 (2d Cir. 1983); *United States v. Boston*, 508 F.2d 1171,

1175 (2d Cir. 1974), *cert. denied*, 421 U.S. 1001, 95 S.Ct.
2401, 44 L.Ed.2d 669 (1975).

*United States v. Silva, supra* at 49.


However, it is acknowledged that "the government bears the burden of
demonstrating by a preponderance of the evidence that a defendant waived his
constitutional rights." *United States v. Lynch*, 92 F.3d 62, 65 (2d Cir. 1996); *United
States v. Anderson*, 929 F.2d 96, 99 (2d Cir. 1991).  I find that the evidence presented
at the suppression hearing establishes that the government has met this burden.  Both
Detective Judge and Special Agent Lamoureaux testified that it was not until after each
defendant had been advised of his rights by Detective Judge, and acknowledged that
he understood his rights, that Special Agent Lamoureaux began his interrogation of
each defendant.  Special Agent Lamoureaux merely asked Buxton, "Whose guns are
they," and he replied, "They belong to DeGounette."  (T. 128-129, 141).  When Buxton
did not respond to Special Agent Lamoureaux's question about the marijuana, the
agent discontinued his interrogation of Buxton and the officers proceeded to the holding
cell where DeGounette was being held.


Special Agent Lamoureaux asked DeGounette about the weapons found
in the vehicle to which the defendant replied that "the guns belonged to him" and that
"he had legally purchased them and he had permits."  (T. 132, 146, 147).  DeGounette
did not respond to Special Agent Lamoureaux's question about the marijuana and

thereupon, this interrogation ceased.

The fact that both defendants remained silent when asked about the marijuana is of no legal consequence in determining their motions to suppress.  A suspect's "silence in response to some questions, does not constitute even an ambiguous or equivocal invocation of the right to remain silent."  *United States v. Ramirez*, 79 F.3d 298, 304 (2d Cir. 1996); *Bradley v. Meachum*, 918 F.2d 338 (2d Cir. 1990), *cert. denied*, 501 U.S. 1221 (1991).

The subsequent statements made by both defendants while in the garage area of the Peace Bridge facility were "spontaneously" made to the officers without being subjected to any form of coercive interrogation and, therefore, were voluntarily made after each defendant had been advised of his rights.  This conclusion is based on this Court's "careful evaluation of the totality of all the surrounding circumstances, including the accused's characteristics, the conditions of interrogation, and the conduct of [the] law enforcement officials" that existed at the Peace Bridge facility on December 19, 2004.  *United States v. Anderson, supra*; *United States v. Lynch, supra*. Therefore, it is RECOMMENDED that the defendants' motion to suppress their statements be DENIED.

Accordingly, pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**ORDERED** that this Report, Recommendation and Order be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report, Recommendation and Order must be filed with the Clerk of this Court within ten (10) days after receipt of a copy of this Report, Recommendation and Order in accordance with the above statute, Fed.R.Crim.P. 58(g)(2) and Local Rule 58.2.

The district judge will ordinarily refuse to consider *de novo*, arguments, case law and/or evidentiary material which could have been, but were not presented to the magistrate judge in the first instance. *See, e.g., Patterson-Leitch Co., Inc. v. Massachusetts Municipal Wholesale Electric Co.*, 840 F.2d 985 (1st Cir. 1988). **Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Judge's Order.** *Thomas v. Arn*, 474 U.S. 140 (1985); *Wesolek, et al. v. Canadair Ltd., et al.*, 838 F.2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 58.2 of the Local Rules for the Western District of New York, "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." **Failure to comply with the provisions of Rule 58.2, or with the similar provisions of**

-14-

**Rule 58.2 (concerning objections to a Magistrate Judge's Report,**

**Recommendation and Order), may result in the District Judge's refusal to**

**consider the objection.**

/s/ H. Kenneth Schroeder, Jr.

_____
**H. KENNETH SCHROEDER, JR.**
**United States Magistrate Judge**

DATED:      **Buffalo, New York**
            **January 30,  2006**